# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| H. MUEHLSTEIN & CO.<br><br>And<br><br>MUEHLSTEIN ADMINISTRATIVE SERVICES, LLC<br><br>    Plaintiffs,<br><br>vs.<br><br>MICHAEL CONNOLLY<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CASE NO. _____<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiffs, H. Muehlstein & Co. and Muehlstein Administrative Services, LLC, (collectively "Muehlstein") by its attorneys, Jackson Lewis LLP, file this Complaint against Michael Connolly, and allege:

### PARTIES, JURISDICTION AND VENUE

1.  This is an action asserting statutory and common law claims, including breach of contract, misappropriation of trade secrets under the Connecticut Uniform Trade Secrets Act, unfair competition in violation of the Connecticut Unfair Trade Practices Act, and violation of the Computer Fraud and Abuse Act.

2.  H. Muehlstein & Co. is a New York corporation and Muehlstein Administrative Services, LLC is a Delaware corporation. Both maintain their principal place of business in Norwalk, Connecticut. Muehlstein Administrative Services, LLC is an affiliate of and shares common ownership with of H. Muehlstein & Co.

1

3. Michael Connolly is a former executive of Muehlstein who, upon information and belief, is a citizen of the State of Illinois and resides at 3308 Falkner Drive, Naperville, Illinois 60564.

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) by virtue of the diversity of citizenship of the parties and the fact that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5. Venue lies in this district under 28 U.S.C. § 1391 because Muehlstein resides in this district and because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this district.

## FACTUAL BACKGROUND

6. Muehlstein is one of the world's leading distributors of polymers and conducts operations throughout the United States and in many overseas countries distributing polymers into a diverse range of industries.

7. In order to maintain its competitive position in the polymer distribution industry, Muehlstein makes significant investments each year in marketing, research and development to develop information, methods, and techniques to: (a) identify entities that use the products it distributes and manufactures; (b) identify the key individuals responsible for making the purchase decisions at those entities; (c) maintain, develop and nurture business relationships with these entities and individuals; (d) learn the business and technological needs of actual and prospective clients; and (e) set appropriate pricing to attract and maintain actual and prospective clients.

8. Muehlstein's position in the polymer industry is largely attributable to the unique relationship it has with its customers and knowledge of confidential customer information. Aside from Muehlstein's quality products, it is this knowledge that provides Muehlstein a significant advantage in the polymer marketplace.

9. Moreover, Muehlstein's research and development is at the cutting edge of innovations in the polymer industry. Muehlstein works closely with its customers and suppliers to meet their particular needs and specifications.

10. Information regarding Muehlstein's polymer customers and/or their end users, as well as information about their technical problems and commercial needs, purchasing habits, internal purchasing procedures and buyer identities, sales strategies, purchasing, payment and credit history, credit limits and credit worthiness, and product information are principal assets of Muehlstein's polymer trading business.

11. Information regarding Muehlstein's polymer customers and/or their end users, as well as information about their technical problems and commercial needs, purchasing habits, internal purchasing procedures and buyer identities, sales strategies, purchasing, payment and credit history, credit limits and credit worthiness, and product information are regarded as highly confidential trade secrets.

12. Such trade secrets are of significant economic value to Muehlstein, and would be of significant economic value to competitors in the polymer industry.

## CONNOLLY'S EMPLOYMENT WITH MUEHLSTEIN

13. Connolly was a former Executive with Muehlstein from 1996 until January 3, 2007.

14. Before joining Muehlstein, Connolly did not have any preexisting relationships with Muehlstein's customers or suppliers.

15. During his employment with Muehlstein, Connolly held positions of increasing responsibility and worked with a wide range of Muehlstein's products and customers.

16. By February 2004, Connolly had assumed a Product Manager role at Muehlstein and served in that role managing, during different periods, Muehlstein's products in the Polyethylene Extrusion and Film Resins segments.

17. As of 2006, Connolly was based in the Chicago area and worked out of a home office using Muehlstein-owned office equipment, including a company-owned laptop.

18. In late 2006, Connolly was promoted to Business Manager – Polyethylene Molding.

19. As the Business Manager – Polyethylene Molding, Connolly assumed responsibility for the overall conceptualization, development, and implementation of both tactical and strategic programs to successfully position current and future Muehlstein Polyethylene products and services for Polyethylene Molding industry. This includes sustaining and growing Muehlstein's market share in current markets as well as leading the efforts for successful new market and product entry to ensure the long-term growth of Muehlstein's polymer products. Connolly was also responsible for developing and maintaining Muehlstein's relationships with its customers and suppliers in other segments and product lines of the polymer industry.

20. Further, by virtue of his position, Connolly frequently worked with other Muehlstein Business Managers managing Polyethylene products used outside the molding industry and obtained confidential information and trade secrets relating to Muehlstein's current and future plans for Muehlstein's Polyethylene business, including its customers and suppliers, regardless of application.

21. Through his employment with Muehlstein, Connolly became aware of most or all of Muehlstein's key customers and suppliers, developed relationships with many of the representatives of those key customers and suppliers, and learned confidential information regarding specific customer and supplier needs and requirements, logistical and supply issues for those customers and suppliers, and pricing information for those key customers and suppliers.

22. Moreover, by virtue of his senior position, Connolly was privy to highly confidential information regarding Muehlstein's business plans and strategy. Connolly was privy to information regarding all segments of Muehlstein's business including its relationships with key customers and suppliers, pricing and supply strategy, and other critical business information which would be invaluable – and unavailable – to a Muehlstein competitor.

23. Connolly also received confidential information regarding most of Muehlstein's suppliers during the last 12 months of his employment with Muehlstein.

24. By virtue of his position at Muehlstein, Connolly was eligible to participate in various incentive plans which provided him with the opportunity to purchase restricted shares in Muehlstein and receive significant bonuses from Muehlstein. These incentives provided benefits to Connolly worth hundreds of thousands of dollars.

25. In exchange for being permitted to participate in incentive plans, Connolly entered into a Non-Solicitation and Confidentiality Agreement ("Agreement") with Muehlstein in May 2006.

26. Under the terms of the Agreement, Connolly agreed "Confidential Information" means any data or information and documentation, other than Trade Secrets, which is valuable to Muehlstein and not generally known to the public, including but not limited to:

> i) Product information, including but not limited to designs, specifications, modifications, advancements and discoveries;
>
> ii) Financial information, including but not limited to earnings, assets, debts, prices, fee structures, volumes of purchases or sales, or other financial data, whether relating to Muehlstein generally, or to particular products, services, geographic areas, or time periods;
>
> iii) Supply and service information, including but not limited to information concerning the goods and services used or purchased by Muehlstein, the names and addresses of suppliers, terms of supplier service contracts, or of particular transactions, or related information about potential suppliers, to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of particular suppliers, though generally known or available, yields advantages to Muehlstein the details of which are not generally known;
>
> iv) Marketing information, including but not limited to details about ongoing or proposed marketing programs or agreements by or on behalf of Muehlstein, marketing forecasts, results of marketing efforts or information about impending transactions;
>
> v) Personnel information, including but not limited to employees' personal or medical histories, compensation or other terms of employment, actual or proposed promotions, hiring, resignations, disciplinary actions, terminations or reasons therefore, training methods, performance or other employee information;
>
> vi) Customer information, including but not limited to any compilations of past, existing or prospective customers, customer proposals or agreements between customers and Muehlstein, status

6

    of customer accounts or credit, or related information about actual or prospective customers; and

    vii) Business information, including but not limited to business plans, minutes of board meetings, financial reports, strategic plans, operations manuals and best practices memoranda.

27. Connolly further agreed that following the cessation of his employment with Muehlstein, he would not, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secret and, for a two year period following the cessation of his employment, would not disclose or disseminate to any other person, organization or entity or otherwise employ any Confidential Information.

28. Connolly agreed that in addition to other non-solicitation restrictions, that for 18 months after his employment with Muehlstein ended, he would not directly or indirectly solicit, contact, call upon, communicate with any supplier of Muehlstein for which the Employee has obtained confidential information, as defined by this Agreement, during the last twelve months of his employment with Muehlstein.

29. Connolly also agreed that in the event of any breaches of the Agreement by him, he would pay all costs (including reasonable attorney's fees) incurred by Muehlstein in establishing the breach and in otherwise enforcing any of the covenants or provisions of the Agreement.

## ACTIONS OF CONNOLLY

30. On January 1, 2007, Connolly used a Muehlstein-owned laptop computer from his home office in Illinois to connect through Muehlstein's secure remote access computer network to access a proprietary database known as "Max." The Max database contains highly sensitive customer data including information on pricing, order history, specific customer requirements, and key contacts. While accessing the Max database, Connolly exported extensive customer data into a spreadsheet using the Microsoft Excel program. By exporting the data, Connolly could copy this information to virtually any computer system and use the information in the commonly available Microsoft Excel program.

31. Connolly later accessed the exported Max database information on January 5, 2007, two days after he had resigned from Muehlstein.

32. The information exported by Connolly consisted of both "Confidential Information" as defined by the Agreement and Trade Secrets as defined by the Agreement and applicable law.

33. On January 2, 2007, Connolly copied all his Outlook e-mails from his Muehlstein-owned laptop to a type of file known as a "PST" file which permits these e-mails and their attachments to be loaded onto any other computer with the commonly available Outlook e-mail program. Connolly copied the PST file on to a portable data storage device commonly known as a "Flash Drive" which would permit the PST file to be loaded on to virtually any computer system where these emails and their attachments could be accessed, read, forwarded, printed, or managed in any other way e-mail is normally used.

34. The PST file Connolly copied contained extensive sensitive, confidential and proprietary information regarding Muehlstein's business plans and reports, its customers and its suppliers.

35. The PST file copied by Connolly consisted of both "Confidential Information" as defined by the Agreement and Trade Secrets as defined by the Agreement and applicable law.

36. On or about January 3, 2007, Connolly informed Muehlstein that he was resigning from his position at Muehlstein.

37. Sometime between January 2, 2007 and January 10, 2007, Connolly deleted all data from the Muehlstein-owned laptop and flash drive, including the PST file he had copied the day before his resignation.

38. Following his resignation from Muehlstein, Connolly accepted a position with Osterman & Company, another distributor of polymer products.

39. The information from the Max database, the information and data contained in Connolly's PST file, and other Confidential Information and Trade Secrets belong to Muehlstein would be extremely valuable to Osterman and to Connolly in his new role.

40. On information and belief, Connolly has or will inevitably use, disclose, disseminate or otherwise employ Muehlstein's trade secrets on behalf of Osterman, and without the consent of Muehlstein.

41. On information and belief, Connolly has or will inevitably disclose or disseminate or otherwise employ Muehlstein's Confidential Information (as defined in the Agreement) on behalf of Osterman, and without the consent of Muehlstein.

## FIRST COUNT
### (BREACH OF CONTRACT)

42. Muehlstein incorporates and realleges Paragraphs 1-41 of this Complaint as though fully set forth herein.

43. By his actions, including those described above, Connolly has breached the provisions of paragraph 3 of his Non-Solicitation and Confidentiality Agreement in that he has or inevitably will use, disclose, disseminate or otherwise employ Muehlstein's Trade Secrets and has or inevitably will disclose, disseminate or employ Muehlstein's Confidential Information.

44. Connolly's breaches, as described herein, injure Muehlstein in that Connolly is able to unfairly benefit himself and his new employer, Osterman, by using Muehlstein's Trade Secrets and Confidential Information to target Muehlstein's customers and suppliers.

45. As a direct and proximate result of Connolly's actions, Muehlstein has suffered and will continue to suffer monetary damages.

## SECOND COUNT
### (MISAPPROPRIATION OF TRADE SECRETS)

46. Muehlstein incorporates and realleges Paragraphs 1-45 of this Complaint as though fully set forth herein.

10

47. Upon information and belief, Connolly actions and inevitable use of Muehlstein's trade secrets as alleged herein constitute a misappropriation within the meaning of Conn. Gen. Stat. § 35-50, et seq.

48. Connolly's misappropriation of Muehlstein's trade secrets has been wanton and with malice.

49. Connolly's misappropriation, as described herein, injure Muehlstein in that Connolly is able to unfairly benefit himself and his new employer, Osterman, by using Muehlstein's Trade Secrets to target Muehlstein's customers and suppliers.

50. Connolly's misappropriation of Muehlstein's trade secrets has caused and will continue to cause Muehlstein severe and irreparable damage.

51. As a direct and proximate result of Connolly's actions, Muehlstein has suffered and will continue to suffer monetary damages.

## THIRD COUNT
### (VIOLATION OF CONN. UNFAIR TRADE PRACTICES ACT)

52. Muehlstein incorporates and realleges Paragraphs 1-52 of this Complaint as though fully set forth herein.

53. Connolly's conduct, as alleged herein, was unethical, unscrupulous, unfair and deceptive.

54. Connolly's conduct was an unfair method of competition and unfair or deceptive acts or practice in violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes § 42-110a-110q.

55. Connolly's actions, as described herein, injure Muehlstein in that Connolly is able to unfairly benefit himself and his new employer, Osterman, by unfairly targeting Muehlstein's customers and suppliers.

56. As a result of Connolly's violations of the Connecticut Unfair Trade Practices Act, Muehlstein has been and will continue to be severely and irreparably damaged.

57. As a direct and proximate result of Connolly's actions in violation of the Connecticut Unfair Trade Practices Act, Muehlstein has suffered and will continue to suffer monetary damages and other harm for which Muehlstein will not have an adequate remedy at law for the harm.

## FOURTH COUNT
(VIOLATION OF THE COMPUTER FRAUD
AND ABUSE ACT, 18 U.S.C. § 1030(a)(5))

58. Muehlstein incorporates and realleges Paragraphs 1-57 of this Complaint as though fully set forth herein.

59. Connolly intentionally accessed a protected computer without authorization or in a manner that exceeded his authorization, causing damage to Muehlstein's systems and information.

60. Connolly knowingly caused transmission of a command and as a result of such conduct, intentionally caused damage without authorization, to Muehlstein's systems and information.

61. As a result of Connolly's actions, Muehlstein suffered losses aggregating at least $5,000 in value during a 1-year period.

## CLAIM FOR RELIEF

WHEREFORE, and as a result of the foregoing, Muehlstein respectfully requests:

A. Preliminary and permanent injunctions prohibiting Connolly from violating his Non-Solicitation and Confidentiality Agreement;

B. Preliminary and permanent injunctions prohibiting Connolly from the use or disclosure of trade secrets in violation of the Connecticut Uniform Trade Secrets Act;

C. Preliminary and permanent injunctions prohibiting Connolly from further unfair methods of competition and unfair or deceptive acts or practices;

D. Compensatory damages,

E. Attorneys' fees and costs as provided for under the terms of the Agreement

F. Punitive damages and attorneys' fees as provided for in Conn. Gen. Stat. § 35-53;

G. Punitive damages and attorneys' fees as provided for in Conn. Gen. Stat. § 42-110g;

H. Costs; and

I. Such other and further relief as this Court may deem proper.

Signed this 23rd day of April 2007.

                PLAINTIFFS,

                H. MUEHLSTEIN & CO.

                and

                MUEHLSTEIN ADMINISTRATIVE
                SERVICES, LLC

By: _____
                Conrad S. Kee
                CT 16904
                Tal A. Kadar CT26723
                JACKSON LEWIS LLP
                177 Broad Street
                P.O. Box 251
                Stamford, Connecticut  06904
                Tel: (203) 961-0404
                Fax: (203) 324-4704
                Email:  Keec@JacksonLewis.com